UNITED STATES of America, Appellee,

v.

Victor DEL TORO SOTO, Defendant, Appellant.

No. 83–1127.

United States Court of Appeals, First Circuit.

Argued Nov. 9, 1983.

Decided Feb. 29, 1984.

John H. LaChance, Boston, Mass., by appointment of the Court, for defendant, appellant.

Lydia Lizarribar, Asst. U.S. Atty., with whom Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before CAMPBELL, Chief Judge, ROSENN,* Senior Circuit Judge, and BREYER, Circuit Judge.

ROSENN, Senior Circuit Judge.

Victor Del Toro Soto and Francisco Rivera Gonzalez were tried to a jury in the United States District Court for the District of Puerto Rico, convicted of and sentenced for aiding and abetting in the tearing, cutting, and injuring of two United States mail pouches and for stealing mail matter and money from a postal employee by use of force and violence in violation of 18 U.S.C. §§ 2, 1706, and 2114. Del Toro Soto then appealed to this court, contending that the district court erred in rejecting his request under the Jencks Act, 18 U.S.C. § 3500 (1976) (the Act), for the production of a report made by a witness for the Government. We agreed with the defendants that the report constituted a "statement" within the meaning of the Act, *United States v. Del Toro Soto,* 676 F.2d 13 (1st Cir.1982), and therefore remanded to the district court for a determination of whether the report was producible within the meaning of section 3500(b).

On remand, the district court conducted a hearing, examined the report, and again concluded that the defendant was not entitled to the report. The district court entered new final judgments of conviction in each case, from which Del Toro Soto has appealed. We affirm his conviction.

## I.

The only direct evidence presented by the Government to establish Del Toro Soto's participation in the crime came from the testimony of Victor Garcia Ramos and Jose Maldonado Vega. The picture that emerged from their testimony went like

this. Garcia Ramos lived with Iris Rivera, a postal clerk at the Hato Rey Station. Sometime prior to September 1980, Garcia Ramos met Del Toro Soto and asked defendant to introduce him to someone who could rob a postal truck. Garcia Ramos seemed to fear that his relationship with Iris Rivera made it unwise for him to take part in such a scheme himself. Del Toro Soto introduced Garcia Ramos to Maldonado Vega and Hector Arriaga. The four agreed to a plan.

Late in the afternoon on September 4, 1980, the four men met at the Quintana Housing Project. They then drove in two cars to the Hato Rey Station. Once there, Garcia Ramos and Del Toro Soto positioned their car so that they could signal their accomplices the moment they spotted the mail truck leaving the station. They gave the signal, and then left the area. Maldonado Vega jumped into the mail truck and flashed a gun at the driver, Enrique Coira. Two blocks later Arriaga hopped into the truck, and the pair instructed the driver to drive to a location where Rivera Gonzalez waited with a car. The threesome ordered driver Coira to open the back of the mail truck, and then took two or three locked pouches from the truck and put them into the trunk of the car in which Rivera Gonzalez had waited. They then locked Coira in the back of the mail truck, rendezvoused with Del Toro Soto and Garcia Ramos, and then all five proceeded to Del Toro Soto's apartment. There they divided approximately $18,900 in cash, with Garcia Ramos, Maldonado Vega, and Arriaga each taking one third of the pot and giving a small portion to Rivera Gonzalez and Del Toro Soto.

On the fifth day of trial, Postal Inspector Cardona, the case agent, testified for the Government. On cross-examination defense counsel inquired as to whether Cardona had made any notes or reports concerning the evidence to which he testified. Cardona replied that he had indeed, including a

* Of the Third Circuit, sitting by designation.

report he filed with the U.S. Attorney's office. The defense thereupon asked that the report be produced. The court denied the request, stating that such a report "is not 3500 material" and therefore "you would not have a right to it." [1]

In remanding, we agreed with the defendant that the report constituted a "statement" within the meaning of the Act. Our remand instructions could not have been clearer:

> The procedure to be .followed on remand is well settled. The district court must examine the report in camera and, after a complete inquiry, supplement the record with express findings. If it is then determined to reaffirm the denial of the motion to produce, new final judgments of conviction should be entered in each case. If appellate review is sought, the report should be placed in a sealed envelope for transmission to this court. If, on the other hand, the report is determined to be producible, there must be a new trial in both cases unless the error is deemed harmless.

*Del Toro Soto, supra,* 676 F.2d at 17.

On May 5, 1982, the district court held a hearing at which it examined the report. On February 8, 1983, it issued a memorandum order stating, among other things, that "[t]he presentation letter [report] did not relate to the subject matter of Inspector Cardona's direct testimony." *United States v. Del Toro Soto,* No. 80–2043, slip op. at 4 (D.P.R. Feb. 8, 1983). It further observed that "we would at best consider the government's failure to produce as harmless error." *Id.*

## II.

### A.

In this appeal, defendant first contends that the district court erred in ruling that no portion of Inspector Cardona's report was producible within the meaning of 18 U.S.C. § 3500(b). He maintains that, although the defense has never been permitted to examine the report, the trial court's discussion comparing the report to Cardona's testimony plainly contradicts its ruling. We agree.

#### 1.

When we remanded this case to the district court, we instructed it to determine whether the report " 'relate[s] generally to the events and activities testified to' " by Inspector Cardona. *Del Toro Soto, supra,* 676 F.2d at 16 (quoting *United States v. Ferreira,* 625 F.2d 1030, 1034 (1st Cir.1980) (quoting *United States v. O'Brien,* 444 F.2d 1082, 1086 (7th Cir.1971)). We reminded the court to "supplement the record with express findings," *Del Toro Soto, supra,* 676 F.2d at 17, so that, on appeal, we could better assess the means by which it pro-

---

1. The pertinent provisions of the Jencks Act, 18 U.S.C. § 3500, state:

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

> (c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use.

> \* \* \* \* \* \*

> (e) The term "statement", as used ... in relation to any witness called by the United States, means—

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.

ceeded from factual findings to its legal conclusion.

Despite our instructions, the district court's opinion suggests that it was more concerned with defending the merits of its prior ruling than with executing the responsibilities with which we charged it. For, after briefly setting forth the procedural history of the case and the governing legal standards, the court immediately issued its conclusion: "The presentation letter did not relate to the subject matter of Inspector Cardona's direct testimony." *United States v. Del Toro Soto,* No. 80–0243, slip op. at 4 (D.P.R. Feb. 8, 1983). The remainder of the opinion, however, conspicuously fails to support this declaration. In its very next sentence, in fact, the court declares that "[c]omparing the letter and the inspector's testimony discloses no deviation because the subject matters overlap." *Del Toro Soto, supra,* slip op. at 4. This remark reflects the unmistakable fact that the district court lacked a clear grasp of its mission. It was first obliged to compare the report with the testimony and decide whether the two "related" to each other. We instructed it that, if the two did not "relate" to each other, it should enter new final judgments of conviction. If, however, the court concluded that the two did "relate" to each other, we instructed it to order new trials "unless the error is deemed harmless." *Del Toro Soto, supra,* 676 F.2d at 17. The court, however, entangled the two tasks. Whether the Government's failure to produce the report harmed Del Toro Soto, however, has nothing at all to do with the baseline question of whether the report should have been produced.

2.

The substance of Inspector Cardona's direct testimony can be divided into four distinct categories: the daily procedures used by the U.S. Postal Service substations to transfer monies collected to the banks; the events surrounding the mistaken arrest of Fernando Gonzalez and the subsequent arrest of his brother, Francisco Rivera Gonzalez; the arrests of co-defendants Victor Garcia Ramos and Jose Maldonado Vega;

and the recovery of the allegedly stolen mail and its submission to New York for fingerprint examination.

We have examined the Cardona report, transmitted to us under seal, and find that it contains personal information, including criminal histories of the defendants; details of the events of September 4, 1980, the date of the alleged criminal activity; a discussion of the anonymous tip that led police to discover some of the missing mail and its submission to New York for analysis; summaries of statements made by driver Enrique Coira, Hector Arriaga, an alleged accomplice whom the government did not charge because he was a minor, and defendants Maldonado Vega, Iris Rivera, Garcia Ramos, and Del Toro Soto; a discussion of the mistaken arrest of Fernando Gonzalez and the subsequent arrest of Francisco Rivera Gonzalez; and a list of government exhibits.

Defendant concedes that the Act does not authorize the production of the entire report. When a government agent merely summarizes the statement made by another individual, for instance, such a summary ordinarily falls outside the scope of the Act unless the particular individual somehow adopts the summary as his own. *Goldberg v. United States,* 425 U.S. 94, 114, 96 S.Ct. 1338, 1350, 47 L.Ed.2d 603 (1976) (Stevens, J., concurring); *Palermo v. United States,* 360 U.S. 343, 352–53, 79 S.Ct. 1217, 1224–25, 3 L.Ed.2d 1287 (1959). The district court found that no such adoption had occurred here with respect to any of the individuals who provided the statements. Thus, those portions of the report that merely summarize the results of interviews with Maldonado Vega, Arriaga, Garcia Ramos, Iris Rivera, and Del Toro Soto are not producible. At the very least, however, those portions of the report that deal with the Gonzalez arrests and the recovery of the mail—events that Inspector Cardona testified to on direct examination—fall squarely within the Act. At least in part, therefore, the report should have been produced.

## B.

The Supreme Court has repeatedly declared that, in Jencks Act cases, courts must narrowly construe the harmless error doctrine. *Goldberg v. United States, supra,* 425 U.S. at 111 n. 21, 96 S.Ct. at 1348 n. 21 ("Since courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial, *Clancy v. United States,* 365 U.S. 312, 316, 81 S.Ct. 645, 648, 5 L.Ed.2d 574 (1961), the harmless-error doctrine must be strictly applied in Jencks Act cases."); *Rosenberg v. United States,* 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959) ("An appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled."). Despite such admonitions, neither the Supreme Court nor the lower federal courts have been especially reluctant to find a Jencks Act violation harmless.

In *Rosenberg v. United States, supra,* defendant had been convicted of transporting in interstate commerce a check that he had fraudulently obtained. On appeal, he claimed the district court should have ordered produced a letter from the victim of the fraud to the prosecutor conceding that her memory had dimmed in the years since the fraud had been perpetrated and that she would therefore have to reread the statement she had originally given to the FBI. Justice Frankfurter, writing for the Court, agreed that such a letter constituted producible Jencks material. He went on to conclude, however, that the error "was empty of consequence" because the witness nevertheless testified to the same information upon cross-examination and questioning by the judge. Justice Frankfurter thus concluded that "[t]here is such a thing as harmless error and this clearly was such." *Rosenberg, supra,* 360 U.S. at 371, 79 S.Ct. at 1234.

A similar situation unfolded in *United States v. Bruton,* 647 F.2d 818 (8th Cir. 1981). The defendant sought to have overturned his convictions for assaulting a federal officer with a deadly weapon and pos-

session of a firearm by a convicted felon. He claimed that the government's failure to produce an FBI "shooting report" constituted reversible error. The court, agreeing with the defendant that the report should have been produced, nevertheless concluded that its production would not have added anything significant to the cross-examination of the agent. 647 F.2d at 827–28. *Accord United States v. Gaston,* 608 F.2d 607 (5th Cir.1979).

■ We do not doubt for a moment the wisdom of a cautious application of the harmless error rule when Jencks Act rights have been implicated. The cases just discussed, however, reflect the practical necessity of invoking the doctrine when the failure to do so would exacerbate the considerable burdens of our system of justice without furthering any important goal. In its brief, the defense correctly states that the only evidence of Del Toro Soto's participation in the alleged crime came from the two accomplice witnesses, Garcia Ramos and Maldonado Vega. At oral argument, the defense admitted that the testimony of Inspector Cardona was not "critical" to the Government's case against Del Toro Soto. We heartily agree. Given these realities, the defendant's imaginative contention that the producible portions of the report would have enabled him to impeach Inspector Cardona strikes us as both difficult to believe and beside the point. First, the defendant had access to most of what the report contained, both prior to trial and throughout the trial. Therefore, if his efforts to impeach Cardona proved unsuccessful *without* the report, we have a good deal of trouble discerning how they could have succeeded *with* the report. Equally important, we fail to see how even the complete devastation of Cardona's testimony could have possibly affected the jury verdicts. To repeat, the evidence that inculpated Del Toro Soto simply did not come from the lips of Inspector Cardona.

We therefore conclude that, although the court erred in not ordering the Government to produce at least "related" portions of the report, its error did not affect the verdict.

We likewise see no merit in defendant's *Brady* contentions. The judgment of the district court is affirmed.